UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| Richard W. Curtis, ) | Case No. 04 B 01751 |
| ) | |
| Debtor. ) | |
| ) | Honorable John D. Schwartz |
| ) | |
| ) | |
| Martin G. Krist, ) | Adv. No. 04 A 03034 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| Richard W. Curtis, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This matter comes before the court on an adversary complaint filed by plaintiff, Martin G. Krist ("Krist")[1] against debtor and defendant, Richard W. Curtis ("Curtis"). The complaint states that Krist seeks relief pursuant to §§523(a)(2)(A), and (a)(2)(B) of the Bankruptcy Code (11 U.S.C. §§101 *et seq.*)[2] finding that an alleged debt is non-dischargeable in this bankruptcy case.

### Findings of Fact

Krist and Curtis became acquainted in 1994. At that time, Krist was a graduate from Cleveland State University with a Bachelor of Science degree in Chemistry. He had never taken

---

[1] Krist appears *pro se*.

[2] All references made to the Bankruptcy Code are made to the Bankruptcy Code prior to the amendments incorporated by the Bankruptcy Abuse Protection and Consumer Protection Act of 2005, because such amendments are not applicable to this case.

any business courses. He had a total of $100,000 in an IRA account and a savings account at Old Phoenix National Bank in Medina, Ohio.

By 1994, the defendant Curtis had worked in the financial services arena and other businesses for almost 30 years. He had experience with leveraged investing on margin, he sold insurance and deferred annuities and invested in international bank instruments. He was licensed by the National Association of Securities Dealers. He recruited sales people and trained them. He, in turn, was recruited by prestigious securities firms and ran one of the most successful branches of one particular firm. In 1987, Curtis formed a corporation known as Intercon Financial Corp., of which he was the sole director and officer, for the purpose of conducting financial, real estate and other business. Defendant's Exhibit 1. Intercon maintained a bank account at Regency Bank in Chicago.

In March of 1994, Krist, on a trip to New York, was introduced to Curtis by his friend, Janet Eckhart. Curtis told Krist about an investment plan called "Accumulation Plan/250". According to Curtis, he acted as the "finder" or "consultant" on investments in bank debentures. The court questioned Curtis at length about the nature of this investment and was never satisfied as to its legitimacy. Plaintiff's Exhibit P is, in part, a document issued by the Securities and Exchange Commission

> alerting investors and regulated entities to the recent escalation in the number of possibly fraudulent schemes involving the issuance, trading or use of so-called 'prime' bank, 'prime' European bank or 'prime' world bank financial instruments. These instruments typically take the form of notes, debentures, letters of credit, and guarantees. Also typical in the offer of these instruments is the promise or guarantee of unrealistic rates of return; e.g., a 150 percent annualized rate of "profits." Common targets of these schemes include both institutional and individual investors, who may also be induced to participate in possible "Ponzi" schemes involving the pooling of investors' funds to purchase "prime" bank financial instruments.

The Accumulation Plan/250 appeared to be just such a fraudulent scheme with a promised annual return of 2080%. A document describing the investment (Plaintiff's Exhibit C), provided that the minimum investment was $250,000 for a term of 40 weeks and that the rate of return would be *40% per week* for a total return of $4,000,000. The document also explains that "[a]t all times the participants invested funds are protected by either an escrow that prohibits the use of the funds for any purpose other than the purchase of a bank purchase order worth many times the value of the investment, or backed by a collateral instrument of greater value, or by profits already placed in a reserve account in the investor's name and ownership. Thus, *under no circumstances does the possibility of a loss to the participant exist.*" (Emphasis added).

Toward the end of Krist and Curtis' first meeting, Krist said to Curtis that he had $100,000 to invest. According to Curtis, he told Krist that that was not enough for the Accumulation Plan/250 but Eckhardt said that she would make an effort to find an investor or investors to come up with the additional $150,000. Curtis gave Krist and Eckhardt a complete set of the paperwork. He testified that he did not think that he would hear from them because they didn't have enough funds to participate.

Curtis testified that in June of 1994 he had a conversation with Krist in which Krist stated that the additional $150,000 would not be available but that he wanted to participate and asked Curtis to find a way for him to do so.

Krist entered into two agreements with Curtis, both dated March 25, 1994. Krist executed a special power of attorney authorizing Curtis to invest Krist's money in the "No Risk investment." Plaintiff's Exhibit F. Krist also executed a "Consulting and Account Management

Agreement." Plaintiff's Exhibit B. The agreement provides that Krist is employing Curtis as a consultant to assist Krist in "making a profit on investment in an investment trading program" and that Curtis would use his expertise and contacts to invest Krist's funds in a "private trading program" which is one of many "sophisticated financial programs" with which Curtis is involved. It further provides that the primary business of the agreement is the investment of $100,000 yielding a profit of 40% per week.

Paragraph 4 of this agreement states that it "revokes, discharges and supersedes all prior representations, warranties or agreements between the parties concerning the subject matter of this agreement except as specifically set forth herein." Paragraph 7 provides that:

> The parties hereto acknowledge and agree that each has been given the opportunity to independently review this agreement with legal counsel, and/or has the requisite experience and sophistication to understand, interpret and agree to the particular language of the provisions hereof. In the event of any ambiguity in or dispute regarding the interpretation of same, the interpretation of this agreement shall resolved [sic] by any rule of interpretation providing for interpretation against the party who causes the uncertainty to exist or against the draftsman.

Krist testified that he did not consult any legal or financial advisor prior to transferring funds to Curtis. Curtis testified that he never heard from anyone representing Krist.

On July 22, 1994, Krist transferred $100,000 from Old Phoenix Bank to the Intercon account at Regency Bank. On August 2, 1994, Krist wrote to Curtis, explaining that he had 60 days from July 22 to return the funds to his IRA account to avoid a tax penalty and asking whether he could get an update at the end of August to "prepare for the return money transfer." Curtis testified that he found a program in August of 1994 in which to "park the money." He said that $125,000 was needed and that he put $25,000 of his own money in.

-4-

On September 19, 1994, Curtis wrote to Krist, giving him two options with respect to Krist's IRA tax obligation. One option involved leaving the funds to grow and paying the tax obligation out of earnings and the other option involved Curtis immediately returning the amount of the tax obligation to Krist. The first option, as illustrated by Curtis, showed Krist with an account worth $16,431,380 after sixteen weeks. The second option, as illustrated by Curtis, showed Krist with an account worth $8,470,681 after sixteen weeks. Defendant's Exhibit 9. Krist testified that he was prepared to set up an offshore account, on Curtis' advice, to hold all of the money he was going to make.

The testimony of both parties indicated that Krist requested $22,500 to pay his tax obligation and that Curtis sent him the funds. There was also testimony to the effect that Krist requested $10,000 back from Curtis around Christmas in 1994 and that those funds were transferred back to him also. Curtis testified that on January 15, 1995, he supplied the $32,500 necessary to maintain the $125,000 balance for the investment.

The investment that Curtis testified he found had the same terms as the Accumulation Plan/250 and the funds were to be placed with Arne Lundh, a Swedish man working out of England with Deutsch Bank. Curtis testified that he checked Lundh's references because he had not worked with him before.

Curtis submitted to the court many pages of correspondence between him and Arne Lundh, dated from March 22, 1995 through December 3, 1996, which paint a picture in which Curtis is initially conducting the transaction and then becoming more frustrated with monies not being where they are supposed to be. In the midst of these alleged difficulties, in August, 1995, Krist received from Curtis an account statement showing that he had earnings to date of $174,400

in addition to the $100,000 deposit. Subtracting the advances that Curtis made to Krist of $32,500, the statement indicated that Krist had a total of $241,900 in his account. Defendant's Exhibit 10. On December 13, 1995, a mere four months later, Curtis alleges that he wrote a letter to the Fraud Squad of Scotland Yard, reporting that $277,000 was stolen from him by Arne Lundh. Defendant's Exhibits 16 - 20. Scotland Yard never responded in writing. No evidence other than Curtis' testimony supports the allegation. Curtis testified that he never received any money from Lundh.

Krist never received any funds from Curtis after the $32,500 was transferred back to him, despite repeated demands. On September 18, 1998, he commenced a lawsuit against Curtis in Ohio. On January 15, 2004, Curtis filed for bankruptcy protection.

### Conclusions of Law

Section 523 of the Bankruptcy Code provides for various exceptions to the dischargeability of debts. The party seeking to establish an exception to the discharge of a debt bears the burden of proof by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287 (1991); In re Sheridan, 57 F.3d 627, 633 (7th Cir. 1995); Kress v. Kusmierek (In re Kusmierek), 224 B.R 651, 655 (Bankr. N.D. Ill. 1998). To advance the policy of giving the debtor a fresh start in bankruptcy, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. Meyer v. Rigdon, 36 F.3d 1375, 1385 (7th Cir. 1994).

Section 523(a)(2)(A) of the Bankruptcy Code[3] provides that a debt is not dischargeable if

---

[3] Krist alleged that he had a cause of action under 11 U.S.C. §523(a)(2)(B) in his complaint but this section is completely inapplicable to the evidence presented at trial.

money, property, services or an extension of credit were obtained by false pretenses, a false representation or fraud. A cause of action under this subsection with an allegation that the debtor made a false representation, requires the following elements to be proven: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; and (3) the creditor relied on the representation. Califf v. Park (In re Park), 2002 WL 130948 (Bankr.N.D. Ill.); Bletnitsky v. Jairath (In re Jairath), 259 B.R. 308 (Bankr. N.D. Ill. 2001). The creditor's reliance must have been justifiable, Field v. Mans, 516 U.S. 59, 74-75, 116 S.Ct. 437 (1995) and "false pretenses" or "representations" are representations knowingly and fraudulently made that give rise to the debt. Driggs v. Black (In re Black), 787 F.2d 503, 506 (10th Cir.1986), *abrogated in part on other grounds*, Grogan v. Garner, 498 U.S. 279, 283, 111 S.Ct. 654 (1991).

Any cause of action under §523(a)(2)(A) requires proving that the debtor acted with intent to deceive. First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey), 761 F.2d 421 (7th Cir. 1985), *overruled on other grounds*. Questions of intent are questions of fact to be determined by the bankruptcy court. Gabellini v. Rega, 724 F.2d 579 (7th Cir. 1984).

Here, Curtis made several false representations. He represented that "under no circumstances does the possibility of a loss to the participant exist." He represented that Krist would earn a profit of 40% per week on his money. He sent Krist an accounting indicating that Krist had a balance of $241,900.

Determining whether Curtis had the requisite intent to deceive Krist in this matter was not an easy task. Curtis presented an elaborate tale, complete with documentation of how he, too, was deceived. However, the court has not been convinced of his innocence. His sophistication and experience simply do not add up to his having been duped. Rather, this court believes that Curtis

purposefully used his expertise to defraud Krist by engaging him in a scheme in which Curtis stood to gain a substantial commission or finder's fee.

The pivotal question in this case is whether Krist was justified in relying on Curtis' representations. In Field v. Mans, the Supreme Court established "justifiable reliance" as the proper standard in §523(a)(2)(A) cases, which is a less demanding standard than reasonable reliance. 516 U.S. at 61, 116 S.Ct. at 439. Reasonable reliance is defined as what would be reasonable for a prudent person to do under the relevant circumstances. In contrast, reliance is justifiable when a person relies on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." Id. at 70 (quoting the Restatement (Second) of Torts §540 (1976)).

The Court in Field v. Mans went on to explain:

> the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have walk[ed] across the street to the office of the register of deeds in the courthouse and easily have learned of an unsatisfied mortgage. [Restatement] at § 540, Illustration 1. The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: Although the plaintiff's reliance on the misrepresentation must be justifiable this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. Id., § 545A, Comment b.

Id. at 70, 116 S.Ct. at 444.

Looking at the qualities and characteristics of this particular plaintiff and the circumstances of this particular case, this court can come to only one conclusion, that as a college-educated person Krist was not justified in relying on representations of Curtis that he would earn a

2080% profit on his money in one year. Krist did not have to conduct an investigation to have ascertained the falsity of Curtis' representations. There was only one place that such returns could have come from and that was from the pockets of persons gullible enough to join in what amounts to a Ponzi scheme. If Krist really believed that this "program" was legitimate, he would have requested the advice of legal or financial counsel before he put every dime he had into it. By failing to examine the investment at all, he assumed its risk. If Krist was the innocent that he would like the court to believe he is one has to wonder why he was also prepared to set up offshore accounts, for the purpose of concealing gains from the taxing authorities. Under the rule of "justifiable reliance", established by the Supreme Court in Field v. Mans he is not entitled to have his claim declared non-dischargeable.

## Conclusion

For the foregoing reasons, Curtis' obligation to Krist is dischargeable.

**ENTERED:**

Date: July 18, 2006

John D. Schwartz
United States Bankruptcy Judge